We move to the third case this morning, United States v. Hidalgo-Sanchez and Luis Gomez. Good morning, counsel. Mr. Jensen, you're proceeding. Yes, your honor. My name is attorney Jeffrey Jensen. I represent the appellant Pablo Hidalgo-Sanchez, and I'm sharing my argument time with counsel for Mr. Gomez, so I'll endeavor to get right to the point. And the point I think in this appeal is whether the district court's decision not to give a limiting instruction under Rule 105, not one time, but two times, whether that's harmless error. I don't think there can be any reasonable argument that the court's refusal to give the instruction is a proper exercise of discretion. There aren't many rules of evidence that speak in mandatory terms, but Rule 105 says that if the court admits evidence for one purpose but not another upon request, the court must give a limiting instruction. The court has some discretion concerning the substance of the instruction, but I don't think there's any discretion to refuse to give the instruction, so I believe that's error. Really, the question that the court will have to answer on this appeal is whether that error is harmless. The government asserts that it is harmless. So Mr. Jensen, the government's key point here seems to be that this Bill of Lading, all told, played such a minor part in the trial, and the government never came back to it. The government didn't use the Bill of Lading as the trial unfolded, and so it's hard to say that it was the kind of pivotal piece of evidence that would flip things one way or the other in the trial. I mean, in other words, it's hard to say this error, even if we assume the judge should have followed Rule 105, and given the limiting instruction you're talking about. I just have trouble seeing how this loomed so large over the trial. Well, it loomed large because this was a trial that was conducted in the middle of the night, and during that week of testimony, there was precious little evidence connecting Mr. Hidalgo Sanchez to a conspiracy with Mr. Gomez or anybody else. This was a critical piece of evidence, which is why my radar was up when the government was introducing the evidence, and the reason it's so critical is because the police intercepted a car hauler that had a fairly large quantity of methamphetamine on it. That hauling of the car was set up by somebody who said his name was Roberto Martinez, but it's the government's theory that it was actually Hidalgo Sanchez, and on this Bill of Lading was a telephone number that the government had associated with Mr. Hidalgo Sanchez. So this was key evidence. It was a large linchpin connecting Mr. Hidalgo Sanchez both to the conspiracy, but also to that telephone number that the government asserted. The government didn't make that argument in so many words before the jury, though, in its closing argument or anything. It just, it was, maybe this isn't my favorite use, and I'll probably mention this to the government, but it says, you know, why did the officer keep talking? Well, he sees this 608 prefix, you know, to the phone number. I hate to even call them area codes anymore because they aren't, but that's typically associated with Madison, Wisconsin, right? Yes. And then the officer thinks this is a little weird. This is coming from California. Now we're in Michigan. You know, what does Madison have to do with anything? And so he keeps talking, he keeps investigating. That's it. That's the whole thing that comes in. I don't have a problem with the admission of the exhibit for the purpose that the government represented it was being admitted for. The jury didn't let that exhibit in the jury room, did they? I didn't think that was one that went back. I would be guessing if I tried to answer that question, I'd have to refer to the record. Okay. But the government itself implicitly conceded that this was extremely important evidence because once the evidence was closed, they filed a motion to have the court admit it for the truth of the matter asserted. I can't think of a more explicit admission that this is important evidence to the government's case. They first represent to the judge that, oh, we're just offering it to show why the officer continued to investigate. But then once the evidence is closed, they attempt to have it admitted for the truth of the matter asserted because that telephone number was really important. And a second reason I believe that this is not harmless error is because as I mentioned a minute ago, there aren't many rules of evidence that speak in mandatory terms, but in this rule, Congress said the court must give the instruction. And I think that's a recognition on the part of Congress that there's a huge possibility, if not a probability, that a jury can misuse evidence. In their brief, the government says, oh, well, the context of admitting this evidence was clear. I'm sure when they went back into the jury room, the jurors all understood that this was not to be used as used for the truth of anything written on the exhibit. And I just think that attributes way more sophistication to lay people on a jury than they actually have. I think to a juror and probably to a lot of lawyers, if something is admitted into evidence, then it's evidence and we can use it and we can draw whatever inferences and conclusions we think are appropriate. So this to me is not harmless error, it's harmful error. It was a critical linchpin piece of evidence and the jury should have been told that they didn't, that they couldn't use it for the truth of the matter asserted. And I think that leaves open the possibility that they misused the evidence in finding Mr. Hidalgo-Sanchez guilty. I can't remember if I had to reserve my rebuttal time myself but at this point, I'll reserve 30 seconds. All right, thank you, counsel. Mr. Nash. Yes, Judge, may it please the court. I'd like to diverge a moment from the facts of this case to tell the court a short story. About 55 years ago, I was a neophyte assistant U.S. attorney and I was having dinner with my parents and my mother asked me what I was working on. I gave a short description of the case. She asked me if it was a good case and I said, the evidence is overwhelming. My father, who had been a prosecutor and later a judge, said, spoken like a true prosecutor. I tell this story because prosecutors always see their evidence as overwhelming but they're also concerned that a jury may see it otherwise. In this case, Cunningham and McMahon and the other cases had been in the law for 14 years and yet the cases in this court tell a story that they've continued to not abide by that rule. They continued to bolster their case with that tainted evidence. So Mr. Nash, you're certainly in this case, you're right, but the government seems to have fallen on its sword about that point. They've said, we made a mistake, this is wrong and I think they, as I understood their brief, they are relying entirely on steps three and four of the plain error analysis and they concede that there was error and that it was plain, which seems to me, in light of the law, it was probably a sensible thing to do but maybe we can focus on whether the bolstering that we see with this litany of questions about the whole Title III process in light of all the rest of the evidence against Mr. Gomez could have made a difference. But they make this argument continually. I know they do and I'm not particularly happy but sometimes there really is a great deal of evidence. Here we have wiretaps, we have overheard conversations, we have surveillance, we have a lot of things that seem to show that Mr. Gomez is deeply involved in a fairly major, as they like to call it, drug trafficking organization. Having nothing to do with this little segment of the trial where they say, oh, and then it goes to so-and-so and then it goes to the main justice and then it goes to somebody else, right? Yes, but if that's true, Judge, let the jury decide if the government's evidence is over. Well, I don't disagree with you except for the fact that there is, we do not have a system under which once you have found error, you just pack up your bags and go home. We try to ask under the correct standard, if it's a harmless error situation, that, if it's a plain error situation, that, whether this error is enough to justify setting aside the result of the trial. Well, with due respect, I understand that. I understand that the court's intent is to, if they view the evidence as overwhelming, but these prosecutors have had this law for 14 years and they don't seem to get the point that this court has made. And in Noel, the court points out that the motivation is obvious. It's to get the jury to agree with their assessment of the case. And if that's the case, then let the jury decide it, not this court, not by the government, by having the verdict in their favor. And therefore they can argue all these reasonable inferences and therefore persuade the court that the evidence is overwhelming, although we didn't think it was overwhelming because we weren't willing to abide by cutting him in the cases that followed. If this was the first or second case that had hit this court, then I think Your Honor's comments would have merit. But this has been the law for 14 years. They violate it whenever it moves them, at least as far as I can see from the cases of this court. Let the jury decide. Send it back. Make them present their evidence to the jury. And if it is overwhelming, as they claim it to be, then the jury will probably convict them fairly and squarely. But right now they use this to bolster their case. And just as Noel says, the motivation was to persuade the jury to agree with their assessment of the case. So I think that Your Honor should reverse and remand the case for retrial before the district court. Thank you. Is there no other? Thank you. Thank you, Judge. Koenig? Good morning, Your Honors. May it please the court. My name is Jonathan Koenig. I appear on behalf of the United States. I think because Mr. Nash spoke with great passion and personal history about Mr. Gomez and the wiretap issue that I will begin there and then return to Mr. Hidalgo Sanchez if that's okay with the panel. I'm glad that it's plain from our brief that we've conceded the first two parts of the plain error analysis. It is certainly fair to criticize the government in this case for not following guidance on this issue that's been clearly laid out in the case law for quite some time. I don't think the record supports an inference that the prosecution deliberately flouted precedent for tactical advantage, but without question, the evidence was not handled in the right way. However, as McMahon makes clear and as Judge Wood's question underscored, something more is required under plain error. And respectfully, Mr. Nash has utterly failed to grapple with the evidence of his client's guilt other than to complain about our characterization of it as overwhelming. He doesn't even discuss the evidence really in his reply brief at all. Thus, as in McMahon, he fails to satisfy the third and fourth parts of the plain error test. And the evidence was considerable. I'm always careful about using the overwhelming word, but I think it's apt here. There was surveillance. There were many, many intercepted phone calls, testimony from a co-conspirator, Brian Banks, and evidence concerning the vehicles tied to the conspiracy that were recovered in different parts of the country with either drugs or cash hidden in them. Well, the intercepted calls alone showed that Gomez knowingly agreed with others, including Banks and Hidalgo Sanchez, to distribute controlled substances. Further, the evidence, and that's to say nothing of the intercepted calls with sources of supply in Mexico and California. There were at least two in Mexico, is that right? There were two individuals in Mexico. With whom he's picked up having a conversation about this business. Correct, Your Honor. One of them was named Panasco, I think. I'm just pronouncing it phonetically. Anyway, Gomez was a leader of this conspiracy, in fact, deeply involved in the logistics of moving drugs and cash back and forth between source of supply and Milwaukee. Thank you. So all of that evidence dooms any argument for reversal under traditional plain error. I will certainly take the message back to my office about the proper way to introduce T3 authorization evidence, whether the court ends up saying a lot or a little about that in its opinion, whether it reverses or whether it affirms. So the question is, how do we solve this problem? Mr. Nash argues, at least implicitly, that the only way to bring the government in line is to throw some reversals at you so you're actually losing the case, not just being scolded. And being scolded, he argues, hasn't seemed to have worked. So what does one do? Do you send it to the Office of Professional Integrity of Justice? Do you send it to Congress? What do you do? What does the court do, Your Honor? Yeah, what does the court do if we say over and over again, the government is just falling back on plain error, it's very hard to show plain error, we know that. It's supposed to be hard to show plain error because we want people to do the right things at trial. But there's something unseemly about the government saying, well, it doesn't matter how sloppy we are because we're always gonna bail out because it's hard to show plain error. Your Honor, I honestly don't know how to answer that question. There's really nothing within the context of this case that the court can do without doing violence to the plain error framework, which is a consequence of another failure in this case, the failure of the defendant to object. I'm certainly willing to own up to our share of the responsibility here at, it's actually a very important issue and our evidence, but neither the court nor the defendant were on top of this either. So other than to suggest greater educational efforts within my office and perhaps within DOJ, I'm not sure I have any really great suggestions. Do we have any idea? I probably should have looked into this before argument, but I didn't. And whether this issue is arising in other circuits or from other U.S. attorney's offices? I don't, Your Honor. I did, while I was just waiting for all the technical things to get ready this morning, I did take a look at some of our training materials, T3, and I just, I don't think I'm telling tales out of school when I say that they're heavy on procedure and light on how this evidence should be presented at trial. So maybe that's something that needs to be corrected. But I don't, I don't, I'm certainly not aware of any, you know, really dramatic cases where a court threw the plain error test out the window and said, no, we're going to reverse because the government needs to learn a lesson here. I can take a look and see and maybe submit something supplemental if that would be helpful to the court. I mean, it's up to Judge Kaney. I don't know. If Judge Wood would like to see something, yes, you can submit something. Thank you. Thank you, Judge. Are there any further questions from the panel on Gomez? Okay. Then if I may, I'd like to address Hidalgo Sanchez. He does raise a broad sufficiency of the evidence challenge. I didn't hear him talk about it this morning, probably because of time limitations. But of course, a sufficiency challenge is an uphill battle as this court is well aware. And the standard requires the court to view the evidence in the light most favorable to government and ask whether any rational prior effect could return a guilty verdict. So can I add a couple of questions about Mr. Hidalgo Sanchez? One of them is sort of what seemed to me to be the disconnect between the account of his participation in this organization and his brief, which focused very heavily on the California to Michigan transaction makes Wisconsin look like an afterthought and your brief, which portrays a much more detailed involvement and especially links to Wisconsin. And one of the things you said that I wasn't sure of, because I didn't see you following up on it, is you allege that Hidalgo Sanchez helped open up new markets for Gomez's drug supply. And I wondered what you meant by that. I simply meant, Your Honor, that their course of dealing contemplated downstream customers. Hidalgo Sanchez had customers, keeping them happy was very much a concern of his, but he also discussed with Gomez the fact, in fact, if you look at only one trial exhibit, one intercepted call in this case, as it relates to Hidalgo Sanchez, it should probably be exhibit 459, which is where he's complaining about the quality of the drugs and Gomez indicates that. This is the wet and crumbly stuff? Yes, Your Honor, exactly. There are other examples as well. So that's really all I meant was that this relationship was more than a buyer seller relationship or a series of isolated purchases from Gomez. It was an ongoing relationship. Gomez was most often the supplier, but sometimes the roles were reversed. They were transacting large quantities of drugs and large dollar amounts. And sometimes the drugs were supplied on credit. That's explicitly discussed in an intercepted call on June 22nd of 2017, that's trial exhibit 463. If the panel looks at only two intercepted calls, I would encourage you to look at 459 and 463 for evidence that this was a conspiracy and not a buyer seller relationship. Now, they wind up with sentences that are actually pretty similar, don't they? Even though Gomez is supposedly the head of all of this and Hidalgo Sanchez is one of many aides. Your Honor, I have to confess I wasn't, I'm not focused on the sentencing issues. That sounds correct to me, but I don't know if that- 156 months for Hidalgo Sanchez and 168 for Gomez, which I understand every day is a day, but still that's pretty close. Yes. Well, there could be a lot of explanations for that. I guess what I was looking for were, and you do address this in your brief, were evidence other than that California to Michigan run that document Hidalgo Sanchez's participation in the organization, in the conspiracy, if you will. And in particular, I guess he's also making a venue argument, right? Things that tie it to the Eastern District of Wisconsin. Certainly. Again, the intercepted calls are really where most of the evidence lies as far as the partnership between Hidalgo Sanchez and Gomez. But there's also physical surveillance, at least one example of physical surveillance that put Hidalgo Sanchez in Milwaukee along with Gomez and other members of the conspiracy. We discussed this towards the end of our brief. They were both arrested in Milwaukee. There was one phone call I remember where Hidalgo Sanchez is calling Gomez from a popular restaurant in Milwaukee about a customer has cash on hand. And can you please get some drugs right away to keep the customer happy? I don't have the citation for that exhibit right off the top of my head, but I know that it's in our brief. So there was certainly, I would argue that the whole venue argument in Mr. Hidalgo Sanchez's brief is a bit of a distraction, but there was a vehicle intercepted in Michigan, but most of the activity as it related to Hidalgo Sanchez anyway was in Milwaukee. And I think it's fair to say by the same token, most of the interaction with the source of supply was between Gomez and people elsewhere, Mexico and California. Judge Pepper really summarized things well when she said that the purpose of the transactions between these two men was to get drugs for other customers and that they relied on each other to be able to get those drugs to pass on to each other's customers. So it's really, she made those remarks in the course of denying the rule 29 motion, but it really underscores that this was a partnership and agreement to distribute controlled substances that went well beyond a buyer seller relationship. So I'm happy to answer any additional questions on either defendants. I don't have more than a minute left. Mr. Koenig, with regard to Judge Wood's inquiry, he'll respond within a week, please. Yes, Your Honor, happy to do so. All right, Mr. Jensen. Well, the only thing I would say in rebuttal concerns the sufficiency of the evidence. And I'd like to amplify something Judge Wood pointed out in her earlier remarks. In this day and age, area codes don't mean anything. And the participants in this alleged conspiracy were all using cell phones. So the fact that it was a 608 or a 414 or any other area code does not establish that he was in the Eastern District of Wisconsin. Mr. Jensen, one question with regard to the interplay involving the ruling on the request for limiting instruction. And I'm referencing pages 729 to 731 of the transcript. You were present. Sometimes when these issues arise, the topic comes up. Well, if we give a limiting instruction, that's going to highlight this piece of evidence. Are you sure, Mr. or Mrs. Defense Counsel, that you want to highlight that in front of the jury? Here, as I read the transcript, first of all, first question is, is there anything in there to that effect? But secondly, as I read the transcript, you indicate to Judge Pepper the mandatory nature of Rule 105. She says, I stand corrected. The court and counsel disagree with regard to whether or not the limiting instruction needed to be given. Then there's a movement to your indication that if there's any argument on this, I'm going to move for a mistrial because this evidence was admitted for one purpose, but not the truth. That's a long question, but what I'm getting towards is the tenor of what that discussion was with regard to highlighting that evidence or the role that evidence played in the case. Well, I had zero concerns that giving a limiting instruction would improperly highlight the evidence. I think there was, whether the government argued it or not in their closing argument, I think this was significant evidence and I didn't actually observe this, but I'm sure the jury sat up straight in their chairs when the evidence came in. And so the question was, is it better for them to not get the limiting instruction and hope that they use it properly or get the limiting instruction and make sure they don't? And I thought it was better to get the limiting instruction  Thank you. I hope that answered the question. It does. Yes, thank you. Thank you, Mr. Jensen. Mr. Nash. Yes, judge. I think there's a misunderstanding of what I'm advocating here. I'm not advocating that the court disregard or throw out the plain error rule, but rather that they enforce it. The government says that we didn't talk about the evidence, what we talked about was the fact that the evidence that they used to bolster their case and therefore get all the reasonable inferences to be able to argue in this court that the evidence was overwhelming, seriously affects the fairness of the proceeding and the substantial rights of the defendant. Enforce the rule. If you have the rule, enforce it. Here it did, especially regarding the witness banks. They have a cooperator, a drug dealer who's on the stand. The fact that they have all these layers of approvals which the jury can easily determine, yeah, this bank must be telling the truth. All these other folks agree with them and believe them. And therefore we think he's telling the truth and we're gonna find for the government. Let the jury decide the case on the admissible evidence. A defendant is not entitled to a perfect trial, but he's entitled to a fair trial. In this case, the government overstepped the bounds. And this court wants to say again, if you do it again, there'll be consequences. The consequences will be the same and we'll be here again in a different case, but with the same argument. The use of this evidence seriously affected the public reputation and integrity of the court and the fairness of the defendant's trial. We ask the court to reverse and remand for retrial. Thank you. Thank you, Mr. Nash. Thanks to both counsel or all counsel. The case is taken under advisement.